**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| JON PURSLEY,<br>on behalf of Plaintiff and the class members<br>described herein,<br><br>Plaintiff,<br><br>vs.<br><br>W6LS, INC., doing business as WithU and<br>WithU Loans;<br>CALIBER FINANCIAL SERVICES,<br>INC.; and DOES 1-20,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT – CLASS ACTION**

1. Plaintiff Jon Pursley brings this action to secure redress from predatory and unlawful loans (such as Exhibits A). The loans are made in the name of Defendant W6LS, Inc., doing business as WithU and WithU Loans ("WithU"). Caliber Financial Services, Inc. ("Caliber") and Does 1-20 are involved in the making, funding, and collection of the loans.

2. Plaintiff alleges violation of the rate limitations of the Indiana Uniform Consumer Credit Code (Count I), violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §1964 (Counts II-III), and restitution (Count IV).

**JURISDICTION AND VENUE**

3. The Court has subject matter jurisdiction under 28 U.S.C. §1331 (general federal question), 18 U.S.C. §1964 (RICO), 15 U.S.C. § 1693m (EFTA), 28 U.S.C. §1337 (interstate commerce), and 28 U.S.C. §1367 (supplemental jurisdiction). Jurisdiction may also exist under 28 U.S.C. §1332(d).

4. This Court has personal jurisdiction over Defendants because they:

a. Knowingly participated in the making and collection of unlawful loans to Indiana residents. In similar actions against purported "tribal" lenders, courts have held that

personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016)*, aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello*, 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures*, 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

b. Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC*, 622 F.3d 754, 760 (7th Cir. 2010).

5. Venue is proper because acts to obtain and collect the loan impacted Plaintiff in Indiana.

6. Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

**PARTIES**

**Plaintiff**

7. Plaintiff Jon Pursley is a citizen of Indiana and resides in Carthage, IN.

**Defendant W6LS, Inc.**

8. Defendant W6LS, Inc., doing business as WithU and WithU Loans ("WithU"), claims to be a corporation organized under the laws of the Otoe Missouria Tribe of Indians ("Tribe"), a federally-recognized Indian Tribe in Oklahoma. It also claims to be owned by the Tribe. Plaintiff disputes this.

9. Defendant WithU operates an online lending website, www.WithULoans.com, which makes loans at interest rates exceeding 400% to consumers in many states, including Indiana.

10. Defendant WithU uses the address of 10600 S. Pennsylvania Ave., Suite 16 #828, Oklahoma City, OK 73170-4257.

11. In fact, this address is a rented private mailbox in a UPS store.

12. The actual principal place of business of Defendant WithU, is in Mission, Kansas.

13. The Otoe-Missouria Tribe of Indians also claims, or claimed to operate, now or in the past, several other online payday lenders, including: (1) American Web Loan, (2) Clear Creek Lending, and (3) Great Plains Lending.

14. Each of these lenders provided off-reservation addresses as their offices, and all of them were rented mailboxes at the same private mailbox provider.

**Defendant Caliber Financial Services, Inc.**

15. Defendant Caliber Financial Services, Inc. ("Caliber") claims to be a corporation organized under the laws of the Tribe. It also claims to be owned by the Tribe. Plaintiff disputes this.

16. Defendant Caliber states on its website, www.CaliberFS.com, that its address is 1611 S. Utica Ave, #527, Tulsa, OK 74104-4909. This address is also a rented UPS Store mailbox.

17. Defendant Caliber states on its website that "[w]e are headquartered in Red Rock, OK with additional offices located in Mission, KS."

18. The website contains a list of job openings. In September 2023, it listed:

a. Executive Administrative Assistant – Overland Park, KS;

b. IT Solution Architect – Overland Park, KS;

c. Technical Business Analyst – Overland Park, KS;

d. Collection Specialist – Mission, KS;

e. Facilities Coordinator – Overland Park, KS. (Exhibit B)

19. Previously, Defendant Caliber listed employment openings for positions as a: (1) Human Resource Assistant; (2) Growth Marketing Manager; and, (3) Senior Direct Marketing Manager, all of which listed the "location" as Mission, Kansas.

20. Defendant Caliber states on its website, www.CaliberFS.com, that it provides "[n]ext Gen Fintech Solutions All In One Place," that "[w]e provide end-to-end portfolio management and personalized fintech solutions for partners who want to expand their portfolio and product offerings," and that "[w]e have the experience, mindset, processes and tools to create real-time, streamlined experiences and personalized fintech solutions that provide expanded revenue streams for the Otoe-Missouria Tribe of Indians."

21. In the argot of the online lending world: "fintech," means Financial Technology companies; "portfolio management" refers to the business of overseeing and collecting short-term payday loans for a fee on behalf of a third party; and "partners" refers to beneficial owners of online lending websites, who provide the working capital to fund loans and who exert high levels of control over the enterprises.

22. Thus, translated into plain English, Caliber's website states it manages collection and underwriting operations on behalf of non-tribal investors who wish to profit from a "tribal" lending model.

**Defendants Does 1-20**

23. Defendants Does 1-20 are other natural or artificial persons involved in the making of short-term, high-interest loans via a business known as WithU Loans. They perform such activities as (1) providing capital to fund the loans, (2) requesting consumer credit reports on

potential borrowers, (3) marketing the lending website, (4) brokering, and/or (5) providing banking services, which include ACH/debit card payment processing and servicing the loans.

**FACTS**

24. Defendants made a loan through www.WithULoans.com over the internet to Plaintiff as follows:

| Plaintiff | Date | Exhibit | Principal | Disclosed APR |
|---|---|---|---|---|
| Jon Pursley | 6/12/25 | A | $1,200.00 | 569.64% |

25. Plaintiff made one or more payments on the loans, including interest.

26. Exhibit A is a standard form loan agreement used by Defendants on a regular basis.

27. Defendants regularly make loans to individuals in Indiana at such rates.

28. The loans were obtained for personal, family or household purposes and not for business purposes.

29. Plaintiff signed the loan agreement electronically, while in Indiana.

30. The funds were transferred electronically to Plaintiff's bank account in Indiana.

31. On information and belief, the transfer was carried out by one of the Does.

32. Repayment was to be made by ACH debit from Plaintiff's bank account in Indiana.

33. The ACH debits were also carried out by one of the Does.

34. Plaintiff was in Indiana at all times.

35. At no time did Plaintiff visit the state of Oklahoma or any business premises of any Defendant in connection with the loans.

36. WithU's website states that it does not lend in all states and that borrowers should call a specified number to find out if it lends to residents of their state. (Exhibit C)

37. The server hosting the WithU website is located in California. (Exhibit D)

38. Defendants were aware that Indiana and other states have rate limitations that applied to their loans. Prior to the loan to Plaintiff, Defendants received a notice from the State of

Washington that their loans to residents of that state were illegal. (Exhibit E)

39. Defendants decided to ignore Indiana's rate limitations because they concluded that Indiana authorities were unlikely to take action to enforce against them.

40. The excessive interest charges imposed by Defendants were willful.

## INDIANA REGULATION OF LENDING

41. The Indiana Uniform Consumer Credit Code establishes a maximum loan finance charge of 36%.

42. Ind. Code § 24-4.5-3-201, authorizes a maximum 25% per annum for consumer loans other than supervised loans. It provides:

> (1) Except as provided in subsections (7) and (9), with respect to a consumer loan, other than a supervised loan (as defined in section 501 [IC 24-4.5-3-501] of this chapter), a lender may contract for a loan finance charge, calculated according to the actuarial method, not exceeding twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter). . . .

43. With respect to supervised loans, the Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-508, provides:

> Loan finance charge for supervised loans.
>
> (1) With respect to a supervised loan, including a loan pursuant to a revolving loan account, a supervised lender may contract for and receive a loan finance charge not exceeding that permitted by this section.
>
> (2) The loan finance charge, calculated according to the actuarial method, may not exceed the equivalent of the greater of:
>
> (a) the total of:
>
> (i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter) which is two thousand dollars ($2,000) or less;
>
> (ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and
>
> (iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than four thousand dollars ($4,000); or

> (b) twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) of this chapter). . . .

44. There is also a provision for small loans, Ind. Code § 24-4.5-7-101 *et seq.*, but it does not authorize the rates charged by Defendants, and requires that small loans conform to other requirements that Defendants' loans do not comply with.

45. Ind. Code. § 24-4.5-7-201, "Limitations on finance charges," provides:

> (1) Finance charges on the first two hundred fifty dollars ($250) of a small loan are limited to fifteen percent (15%) of the principal.
>
> (2) Finance charges on the amount of a small loan greater than two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400) are limited to thirteen percent (13%) of the amount over two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400).
>
> (3) Finance charges on the amount of the small loan greater than four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550) are limited to ten percent (10%) of the amount over four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550).
>
> (4) The amount of five hundred fifty dollars ($550) in subsection (3) is subject to change under the provisions on adjustment of dollar amounts (IC 24-4.5-1-106). However, notwithstanding IC 24-4.5-1-106(1), the Reference Base Index to be used under this subsection is the Index for October 2006.

46. The amount of finance charge provided for in Exhibit A is more than double that permitted in Indiana under any provision.

47. Ind. Code § 24-4.5-1-201, "Territorial application," provides:

> (1) Except as otherwise provided in this section, this article applies to sales, leases, and loans made in this state and to modifications, including refinancings, consolidations, and deferrals, made in this state, of sales, leases, and loans, wherever made. For purposes of this article, the following apply: . . .
>
> > (c) A loan or modification of a loan agreement is made in this state if a writing signed by the debtor and evidencing the debt is received by the lender or a person acting on behalf of the lender in this state.
> >
> > (d) Except as provided in subdivisions (e) and (f), a sale, lease, or loan transaction occurs in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction with a creditor or a person acting on behalf of the creditor in another state and the creditor or the person acting on behalf of the creditor has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means.

(e) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction secured by an interest in land located outside Indiana.

(f) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction at a creditor's place of business in another state.

For purposes of subdivisions (a) through (c), an offer is received by a creditor or a person acting on behalf of the creditor in Indiana if the offer is physically delivered, or otherwise transmitted or communicated, to a person who has actual or apparent authority to act for the creditor or the person acting on behalf of the creditor in Indiana, regardless of whether approval, acceptance, or ratification by any other agent or representative of the creditor or the person acting on behalf of the creditor in another state is necessary to give legal consequence to the consumer credit transaction. . . .

(5) Notwithstanding other provisions of this section:

(a) except as provided in subsection (2), this article does not apply if the buyer, lessee, or debtor is not a resident of this state at the time of a credit transaction and the parties then agree that the law of the buyer's, lessee's, or debtor's residence applies; and

(b) this article applies if the buyer, lessee, or debtor is a resident of this state at the time of a credit transaction and the parties then agree that the law of this state applies.

(6) Except as provided in subsection (5), the following agreements by a buyer, lessee, or debtor are invalid with respect to consumer credit sales, consumer leases, consumer loans, or modifications thereof, to which this article applies:

(a) An agreement that the law of another state shall apply.

(b) An agreement that the buyer, lessee, or debtor consents to the jurisdiction of another state.

(c) An agreement that fixes venue. . . .

(8) If a creditor or a person acting on behalf of the creditor has violated the provisions of this article that apply to the authority to make consumer loans (IC 24-4.5-3-502), the loan is void and the debtor is not obligated to pay either the principal or loan finance charge, as set forth in IC 24-4.5-5-202.

48. Ind. Code § 24-4.5-5-202, "Effect of violations on rights of parties," provides:

. . . (3) A debtor is not obligated to pay a charge in excess of that allowed by this Article, and ***if the debtor has paid an excess charge the debtor has a right to a refund***. A refund may be made by reducing the debtor's obligation by the amount of the excess charge. If the debtor has paid an amount in excess of the lawful obligation under the agreement, the debtor may recover the excess amount from the person who made the excess charge or from an assignee of that person's rights who undertakes direct collection of payments from or

enforcement of rights against debtors arising from the debt.

(4) ***If a debtor is entitled to a refund and a person liable to the debtor refuses to make a refund within a reasonable time after demand, the debtor may recover from that person a penalty in an amount determined by a court not exceeding the greater of either the amount of the credit service or loan finance charge or ten (10) times the amount of the excess charge. If the creditor has made an excess charge in deliberate violation of or in reckless disregard for this Article, the penalty may be recovered even though the creditor has refunded the excess charge.*** No penalty pursuant to this subsection may be recovered if a court has ordered a similar penalty assessed against the same person in a civil action by the department (IC 24-4.5-6-113). With respect to excess charges arising from sales made pursuant to revolving charge accounts or from loans made pursuant to revolving loan accounts, no action pursuant to this subsection may be brought more than two (2) years after the time the excess charge was made. With respect to excess charges arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one (1) year after the due date of the last scheduled payment of the agreement pursuant to which the charge was made. . . .

(7) If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability is imposed under subsections (1), (2), and (4) and the validity of the transaction is not affected.

(8) In any case in which it is found that a creditor has violated this Article, the court may award ***reasonable attorney's fees*** incurred by the debtor. . . . (Emphasis added)

## INVALIDITY OF CLAIM OF TRIBAL IMMUNITY

49. In an attempt to evade prosecution under usury laws of states like Indiana, online lenders frequently create an elaborate charade claiming their otherwise illegal businesses are entitled to the sovereign immunity of Native American tribes.

50. However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

51. To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the

entities." *Breakthrough* at 1183, 1187-88.

52. These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, are conducted by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

53. Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

54. Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff*, 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

55. Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

56. A review of the online resumes of Caliber employees shows none with any connection to the Tribe or that live on the Tribe's reservation.

57. On March 22, 2023 (Exhibit F), and again on September 21, 2023 (Exhibit G), the LinkedIn profile for Charlie Corbin, "Recruiting Manager at Caliber Financial Services" contained links for open positions in "Overland Park, Kansas," "Mission, Kansas" or "Kansas City Metropolitan Area."

58. Corbin's own location was given as Sugar Land, Texas.

59. Tim Madsen, Chief Marketing Officer at Caliber, gave his location as Mission, Kansas (Exhibit H), as did Doug Oliveira, Chief Information Officer (Exhibit I).

60. On information and belief, no open positions for employment with Caliber list the Tribe's reservation in Oklahoma as a work-site.

61. Virtually none of WithU's business is conducted on the Tribe's reservation.

62. All essential business operations are performed in other locations outside of the Tribe's jurisdiction.

63. Off-reservation business operations, comprising substantially all of the company's functions, are conducted by and for the benefit of non-tribal members and investors.

64. The argument that, because the Tribe's name appears on WithULoans.com as the owner of the business, it is owned by the Tribe, is meritless.

65. The Tribe receives only a couple of pennies of each dollar as "rent," and 98% or more of revenues flow to non-tribal persons and entities.

66. While the Tribe's name and the names of some officers appear in documents establishing the formation of the corporate charters under which WithU and Caliber operate, on information and belief, such documents were designed, written by, approved by, and crafted for the benefit of non-tribal beneficiaries.

67. According to the U.S. Department of Health and Human Services, per capita income for the Tribe in between 2015 and 2019 averaged $13,887 per year. *See* https://www.acf.hhs.gov/sites/default/files/documents/cb/tribal-fmap reference-fy2022.pdf.

68. The Tribe has no significant assets to leverage as collateral for the multi-million dollar revolving lines of credit required to fund multiple online payday lending enterprises which lend upward of $100 million a year.

69. On information and belief, while the Tribe is the nominal owner of WithU and Caliber, covenants in the lines of credit used as working capital to fund loans require the Tribe to

hire only investor-approved managers, underwriters, marketers, software vendors, and other service providers.

70. The loan covenants also require the Tribe to waive sovereign immunity with respect to the non-tribal investors, leaving the Tribe vulnerable to legal action.

71. Thus, the Tribe exerts no control over the business, how it is operated, who it lends to, and so forth. Any tribal involvement does not go beyond the hiring of a handful of tribal members to work as phone customer service representatives or similar low-level jobs.

72. The Tribe has engaged in other similar "rent-a-tribe" schemes with other non-tribal investors in the past, including one which resulted in a class action lawsuit being filed against it.

73. In July 2021, a federal court approved an $86 million settlement in which the plaintiffs alleged the Tribe engaged in a rent-a-tribe scheme concerning American Web Loan; non-tribal individuals and entities – including two Wall Street Hedge Funds – colluded to make illegal loans to consumers at triple-digit interest rates and make it appear that the Tribe was the owner of the lending enterprise, despite the Tribe having almost no involvement in the loans and receiving less than 2% of revenues. *Solomon v. American Web Loan*, 375 F. Supp. 3d 638 (E.D. Va. 2019).

74. Weeks after the court's final approval of the $86 million settlement, WithU began lending operations.

**COUNT I – INDIANA UNIFORM CONSUMER CREDIT CODE**

75. Plaintiff incorporates paragraphs 1-74.

76. This claim is against all Defendants.

77. Because the loan made to Plaintiff violated the rate limits set by Indiana law, and the violation was intentional, Plaintiff and other borrowers are entitled to ten (10) times the amount of the excess charge.

**CLASS ALLEGATIONS**

78. Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and

(b)(3).

79. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made via www.WithU.com at more than 36% interest (all of its loans qualify) (c) on or after a date two years prior to the filing of this action.

80. Plaintiff may alter the class definition to conform to developments in the case and discovery.

81. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are over 100 class members.

82. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

83. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

84. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

85. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

i. Damages as provided by statute;

ii. Attorney's fees, expenses and costs; and

iii. Such other or further relief as is appropriate.

## COUNT II – RICO

86. Plaintiff incorporates paragraphs 1-74.

87. This claim is against Caliber and the Does, who are the RICO "persons."

88. All loans made via www.WithU.com to Indiana residents are (a) unenforceable under Indiana law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the loan was made on or after a date four years prior to the filing of this action, and (d) the usurious rate is at least twice the enforceable rate (36%).

89. The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

90. WithU, Caliber and the Does constitute an association in fact enterprise, existing for the purpose of making high-interest loans.

91. The association in fact enterprise affects interstate commerce, in that it has physical locations outside of Indiana and makes loans to Indiana residents via the Internet.

92. Defendants Caliber and the Does are associated with the enterprise, in that they direct and control its lending activities.

93. Defendants Caliber and the Does conducted or participated in the conduct of the affairs of the association in fact enterprise through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. § 1962(c).

94. Plaintiff was deprived of money as a result.

## CLASS ALLEGATIONS

95. Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

96. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made via www.WithU.com at more than 72% interest (c) which loan was made on or after a date four years prior to the filing of this action.

97. The class is so numerous that joinder of all members is not practicable. On

information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

98. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

a. Whether the loans at issue are "unlawful debts" as defined in RICO.

b. Whether WithU, Caliber and the Does constitute an association in fact "enterprise."

c. Whether Defendants are associated with the enterprise.

d. Whether Defendants conducted or participated in the affairs of the enterprise through a pattern of making and collecting unlawful loans.

99. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

100. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

101. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

i. Treble damages;

ii. Attorney's fees, litigation expenses and costs of suit; and

iii. Such other or further relief as the Court deems proper.

**COUNT III – RICO**

102. Plaintiff incorporates paragraphs 1-74.

103. This claim is against Caliber and the Does, who are the RICO "persons."

104. All loans made via www.WithU.com to Indiana residents are (a) unenforceable under Indiana law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the usurious rate is at least twice the enforceable rate (36%).

105. The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

106. WithU is an enterprise, in that it is duly organized entity.

107. The enterprise affects interstate commerce, in that it has physical locations outside of Indiana and directs the making of loans to Indiana residents via the Internet.

108. Defendants Caliber and the Does are associated with the enterprise, in that they direct and control its lending activities.

109. Defendants Caliber and the Does conducted or participated in the conduct of the affairs of the enterprise through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. § 1962(c).

110. Plaintiff was deprived of money as a result.

## CLASS ALLEGATIONS

111. Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

112. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made via www.WithU.com at more than 72% interest (c) which loan was made on or after a date four years prior to the filing of this action.

113. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

114. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

a. Whether the loans at issue are "unlawful debts" as defined in RICO.

b. Whether www.WithU.com is an "enterprise."

c. Whether Defendants are associated with the enterprise.

d. Whether Defendants conducted or participated in the affairs of the enterprise through a pattern of making and collecting unlawful loans.

115. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

116. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

117. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

i. Treble damages;

ii. Attorney's fees, litigation expenses and costs of suit; and

iii. Such other or further relief as the Court deems proper.

**COUNT IV – RESTITUTION**

118. Plaintiff incorporates paragraphs 1-74.

119. This claim is against all Defendants.

120. Defendants obtained money from Plaintiff through unjust and inequitable means, such that they should be compelled to make restitution.

**CLASS ALLEGATIONS**

121. Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

122. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan

was made via www.WithU.com at more than 36% interest (all of its loans qualify) (c) on or after a date six years prior to the filing of this action.

123. Plaintiff may alter the class definition to conform to developments in the case and discovery.

124. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are over 100 class members.

125. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants should be compelled to make restitution.

126. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

127. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

128. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

i. Appropriate monetary relief;

ii. Costs; and

iii. Such other or further relief as is appropriate.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Dulijaza (Julie) Clark

Alexandra R. Huzyk
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603-1841
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com
dedelman@edcombs.com
jclark@edcombs.com
ahuzyk@edcombs.com

T:\41978\Draft Complaint (One Plaintiff)_.WPD

## **JURY DEMAND**

Plaintiff demands trial by jury.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

**NOTICE OF ASSIGNMENT**

Please be advised that all rights relating to attorney's fees have been assigned to counsel.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

**DOCUMENT PRESERVATION DEMAND**

Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein, any third party associated with any telephone call, campaign, account, loan, sale or file associated with Plaintiff, and any account or loan or number or symbol relating to them. These materials are likely relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendants.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

## Exhibits

| | |
|---|---|
| A | Pursley's loan agreement |
| B | List of job openings with Caliber Financial Services, Inc. |
| C | Material from WithU website |
| D | location of WithU website server |
| E | Notice from State of Washington |
| F | March 22, 2023 LinkedIn profile for Charlie Corbin |
| G | Sept. 21, 2023 LinkedIn profile for Charlie Corbin |
| H | Information re Tim Madsen, Chief Marketing Officer at Caliber |
| I | Information re Doug Oliveira, Chief Information Officer at Caliber |